UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
ROBERT BINDER,

                         Plaintiff,             **<u>MEMORANDUM AND ORDER</u>**

 - against -                        2:19-cv-5787 (DRH)(ST)

PUBLIC SERVICE ENTERPRISE GROUP,
INCORPORATED, LONG ISLAND
ELECTRIC UTILITY SERVCO LLC and
MICHAEL VOLTZ,

                         Defendants.
--------------------------------------------------------------X

**APPEARANCES**

**AKIN LAW GROUP, PLLC**
Attorneys for Plaintiff
45 Broadway, Suite 1420
New York, NY 10006
By:   Robert D. Salaman, Esq.

**FISHER & PHILLIPS LLP**
Attorneys for Defendants
620 8th Avenue, Suite 3650
New York, NY 10018
By:   Melissa Jill Camire, Esq.

**HURLEY, Senior District Judge:**

## INTRODUCTION

      Plaintiff Robert Binder ("Plaintiff") brought this employment discrimination

action against Defendants Public Service Enterprise Group, Incorporated ("PSEG

Inc."), Long Island Electric Utility Servco LLC ("PSEGLI" and, together with PSEG

Inc., "PSEG" or the "Company") and Michael Voltz ("Voltz" and, collectively with

PSEG, "Defendants") pursuant to the American with Disabilities Act of 1990 ("ADA"),

Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York State Human Rights Law ("NYSHRL"), alleging that Defendants discriminated against him on the basis of disability.  Presently before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 seeking to dismiss Plaintiff's claims in their entirety.  For the reasons below, Defendants' motion is granted.

## BACKGROUND

The following facts, taken from the parties' Local Rule 56.1 statements, are undisputed unless otherwise noted.  (*See* Defs. Local Civil Rule 56.1 Statement ("Def. 56.1") [DE 36-1]; Pl. Response Statement ("Pl. 56.1 Resp.") [DE 37-1]).

### A.    PSEG and its Nondiscrimination Policies

PSEG Inc. is an energy company headquartered in Newark, New Jersey which, through its contract with nonparty Long Island Power Authority, distributes electricity to Long Island, New York. (Def. 56.1 ¶¶ 1–2).  PSEG Inc. does so through its subsidiary PSEGLI.  (*Id.* ¶ 3).  PSEGLI is also responsible for maintaining and/or restoring power during hurricanes, blizzards, and other major storm events.  (*Id.* ¶¶ 26–27).  Accordingly, PSEGLI assigns employees to emergency "storm duty" roles in addition to their "normal," day-to-day job responsibilities.  (*Id.*).

PSEG's Human Resources department makes accessible to all employees its nondiscrimination policies, which, *inter alia*, prohibit disability discrimination and outline procedures to obtain reasonable accommodations.  (*Id.* ¶¶ 7–8, *see id.* ¶¶ 9–10 (Equal Employment Opportunity policies); *see id.* ¶¶ 11–14 (Reasonable Accommodations for Pregnancy and/or Disability policy).   It also periodically

circulates the Standards of Conduct, which prohibit using PSEG assets for anything other than legitimate business purposes, forbid disclosure of confidential information without proper authorization, and prohibit workplace gambling and fantasy sports. (*Id.* ¶¶ 15–16; *see id.* ¶ 17 (setting forth specific policy language)).

## C.    2015 and 2016: Plaintiff's First Two Years at PSEGLI

In 2015, Plaintiff applied to an open PSEGLI Staff Engineer position in the Planning and Evaluation group, representing he was "proficient in Microsoft Office Applications," which include Microsoft Excel. (*Id.* ¶¶ 6, 24–25; Ex. E [DE 36-3] to Decl. of Melissa J. Camire ("Camire Decl.") [DE 36-2]). Nonparty Daniel Zaweski ("Zaweski"), who oversees the Planning and Evaluation group, interviewed Plaintiff and ultimately recommended the hire to Energy Efficiency and Renewables department-head Michael Voltz. (Def. 56.1 ¶¶ 3–4, 19–21). Plaintiff was hired in July 2015. (*Id.* ¶ 18). He was primarily responsible for reducing Long Island's electricity demand through technical review of projects and products and through calculation of savings claims, requiring him to use Microsoft Excel regularly. (*Id.* ¶¶ 22–24).

Nonparty Christine Bryson ("Bryson"), who organizes storm duty roles, assigned Plaintiff to an Emergency Operations Center ("EOC") Liaison role. (Def. 56.1 ¶¶ 27–28; Decl. of Christine Bryson ¶ 3 ("Bryson Decl.") [DE 36-4]). In that capacity, Plaintiff would staff Long Island EOCs according to schedules set by Voltz. (Tr. of Deposition of Michael Voltz ("Voltz Tr.") at 38:2–40:20, Ex. C to Camire Decl.). According to Plaintiff, Bryson and Voltz "worked closely together" to set storm duty

roles and schedules, although Bryson avers she does not report to Voltz.  (Bryson Decl. ¶ 4; Def. 56.1 ¶¶ 29, 142).  Bryson further avers that Plaintiff, in his storm role capacity, reported to Liaison Officer Chris Hahn, who did not report to Voltz or Zaweski.  (Pl. 56.1 Resp. ¶ 182; Affidavit of Plaintiff Robert Binder ¶ 16 ("Pl. Aff.") [DE 37-4]).

Zaweski testified that, from the outset, Plaintiff failed to give him the level of support or output he expected.  (Def. 56.1 ¶ 31).  At Plaintiff's 2015 year-end performance review, held on March 6, 2016, Zaweski rated Plaintiff's Results as "Needs Improvement"—the lowest rating—and his Behavior as "Models"—the highest.  (*Id.* ¶¶ 30, 32; Ex. M [DE 36-7] to Declaration of Margaret Degrassi ("Degrassi Decl.") [DE 36-6]).

For 2016, Zaweski sought better fitting opportunities for Plaintiff, ultimately choosing to involve him in some Requests for Proposals projects.  (Def. 56.1 ¶ 33).  Plaintiff's performance, in Zaweski's view, "improved somewhat."  (*Id.* ¶ 34).  At Plaintiff's 2016 year-end performance review, Zaweski rated Plaintiff's Results as "Achieves" and Behavior as "Developing"—each the middle rating in their respective categories.  (*Id.* ¶¶ 30, 35).

D.    **2017: Plaintiff's Two Violations and Poor Performance**

When the Request for Proposals projects concluded, Zaweski tasked Plaintiff with managing a "demand response and smart thermostat program."  (*Id.* ¶ 36).  Zaweski testified Plaintiff had a "less than desirable" performance, did not "seem to

make progress," "seemed confused," and "seemed to rely completely on [PSEG's] third-party contractor to do anything." (*Id.* ¶ 37).

On February 20, 2017, Plaintiff informed Zaweski that he was in the hospital about to undergo some type of heart procedure. (*Id.* ¶¶ 123–25; *see* Ex. F to Camire Decl.). Two days later, Plaintiff advised Zaweski via email that he was taking the day off. (Def. 56.1 ¶¶ 126–27; *see* Ex. G to Camire Decl.). On or about October 9, 2017, Plaintiff was diagnosed with atrial fibrillation. (Def. 56.1 ¶ 122). Plaintiff avers that, around this time, he "specifically asked Zaweski to be removed from storm duty" and "complained to Zaweski that [he] was frustrated that PSEG was not taking [his] heart condition seriously." (Pl. Aff. ¶ 16; Tr. of Deposition of Plaintiff Robert Binder at 51:21–53:18, 96:24–97:17 ("Pl. Tr."), Ex. B to Camire Decl.).

Later that autumn, Plaintiff joined a fantasy football league with two coworkers, each paying $150 to join. (Def. 56.1 ¶¶ 92–93; Ex. U to Camire Decl.). In competing, Plaintiff used his PSEGLI-issued email and computer. (Def. 56.1 ¶ 91).

On November 20, 2017, Plaintiff separately emailed two outside vendors responsible for administering PSEGLI's "dynamic load management" program: Enernoc and Energy Spectrum. (Def. 56.1 ¶¶ 55–61). Each email was supposed to include a password-protected Excel spreadsheet containing only that vendor-recipient's confidential customer information: *e.g.*, customer names, PSEGLI account number, and payment information. (*Id.*). But when each vendor entered the password, each saw not only its confidential customer information but that of the other as well. (*Id.*). When Energy Spectrum immediately confronted Plaintiff with

his mistake, he admitted he "recognized that it was a big deal" and reckoned he "might get fired" for this incident. (*Id.* ¶¶ 62–64; Pl. 56.1 Resp. ¶ 81).[1]  Plaintiff then twice emailed Zaweski in an attempt to bring attention to the error. (Def. 56.1 ¶¶ 65–66).  First, Plaintiff forwarded Zaweski one of the emails with the Excel spreadsheet, adding "Bad news !" in the subject line and writing "Please call me" in the body.  (*Id.* ¶ 64; Ex. O to Camire Decl.).  Second, Plaintiff emailed Zaweski in an unrelated email conversation chain, writing without context, "[t]he file got sent with the comparison tab attached."  (Def. 56.1 ¶ 66; Ex. P to Camire Decl.).  Zaweski received Plaintiff's emails but found neither clear and chose not to respond. (*Id.* ¶ 67; Ex. B [36-9] to Declaration of Carrie Dunican ¶ 4 ("Dunican Decl.") [DE 36-8]).  Plaintiff made no additional efforts to discuss the matter with Zaweski.  (Def. 56.1 ¶ 68).

On November 27, 2017, Zaweski emailed PSEGLI's Senior HR Business Partner, Margaret Degrassi ("Degrassi") to ask her advice in addressing his perceived deficiencies with Plaintiff's performance. (*Id.* ¶¶ 38–39).  Those deficiencies included "very poor" performance, "lack of attention to detail," "poorly written, mathematically incorrect and always late" materials, failure to "demonstrate[] any real capability to develop either an expertise in battery technology nor in . . . lower level engineering analysis," apathetic attitude, and refusal to retake the Certified Energy Manager accreditation test he failed.  (*Id.* (emphases omitted)).  Indeed, Zaweski and Voltz testified that Plaintiff's coworkers complained at the time that he "creat[ed] a

---

[1]     Plaintiff admits that he said he "might get fired" but contends he "did not actually believe he was going to get fired."  (Pl. 56.1 Resp. ¶ 81).

distraction and impact[ed] the department's morale." (*Id.* ¶ 40). While Zaweski acknowledged Plaintiff as a "charitable, generous," and "nice person" who "had some medical issues" in the recent past, he concluded that "things just do not seem to be working out." (*Id.* (emphasis omitted)).

### E.   2018: Investigation and Termination

On February 13, 2018, PSEGLI learned that Energy Spectrum's President expressed dissatisfaction with how PSEGLI handled the disclosure of Energy Spectrum's confidential information on November 20, 2017. (*Id.* ¶ 69; *see* Ex. Q to Camire Decl.). Voltz, who did not know what happened, asked Zaweski to explain; Zaweski in turn asked Plaintiff. (Def. 56.1 ¶¶ 70–73). Plaintiff forwarded Zaweski the "Bad news !" email. (Ex. R to Camire Decl.). After a debriefing from Zaweski, Voltz reported the findings internally. (Def. 56.1 ¶¶ 74–75).

The next day, February 14, 2018, Plaintiff went to the Emergency Room "with [a] heart problem." (*Id.* ¶¶ 128–29; *see* Ex. T to Camire Decl.). Plaintiff let Zaweski know via text that he was scheduled for a procedure the following morning. (Ex. T to Camire Decl.). The record does not reflect what procedure Plaintiff underwent.

On March 6, 2018, Plaintiff learned he was "scheduled to work . . . from 8PM [Wednesday] to 8AM Thursday" and asked Zaweski for a vacation day.[2] (Def. 56.1 ¶ 130; Ex. H to Camire Decl.). Zaweski approved the request but noted that, given

---

[2]     Plaintiff avers that he "specifically asked Zaweski to be removed from storm duty," but he does not say when or how. (Pl. Aff. ¶ 16). The Court assumes that the March 6, 2018 email exchange reflects this request, although the request is not expressly made in the email.

the way vacation time worked, Plaintiff would get either get "4 hour vacation [on Wednesday] or begin [his shift] at 4PM and then work till 8AM Thursday." (Def. 56.1 ¶ 131). Plaintiff opted for the former, reminding Zaweski that he "ha[s] a heart problem." (*Id.* ¶¶ 132, 134). Zaweski responded: "I can't get in the middle of health issues but if your doctor has recommended some restrictions on your activities[,] you should speak with our [H]ealth and [W]ellness folks – they are there to work with employees on private medical matters." (*Id.* ¶ 133). Plaintiff never contacted anyone in Health and Wellness nor "asked [Zaweski], or anyone else at PSEG, how to get in touch with" them. (*Id.* ¶¶ 135–36).

Three days later, on March 9, 2018, Zaweski held Plaintiff's 2017 year-end performance review.[3] (Ex. K to Camire Decl.). Zaweski rated Plaintiff's Results as "Needs Improvement"—the lowest rating—and his Behavior as "Developing"—the middle rating. (Def. 56.1 ¶¶ 41–42). Zaweski's written review included a comment that Plaintiff's "apathetic" approach in the two-plus years of employment demonstrated an inability to function in the manner "expected of an engineer." (*Id.*).

Following the poor performance evaluation, Zaweski worked with Voltz and PSEGLI's Human Resources department to create for Plaintiff a Performance Enhancement Plan ("PEP") to run from March 1, 2018 to July 30, 2018. (*Id.* ¶¶ 43, 46–47). PEPs are instituted when an employee's performance is deficient and requires corrective action; they identify perceived deficiencies in performance and

---

[3]     The review was originally scheduled for March 2, 2018 but was rescheduled because Plaintiff "was performing storm duty" that day. (Ex. K to Camire Decl.).

provide steps and goals aimed at correcting them.  (*Id.* ¶¶ 44, 49–50).  It specifically puts employees on notice "of the actions required of [them] to maintain [their] employment."  (Ex. L to Camire Decl.).  But it also advises, "[N]othing in this [PEP] guarantees your continued employment for any period of time" and "Your employment may also be terminated at any time during this process, if it is determined that there is a lack of compliance . . . or if you fail to comply with PSEG policies or procedures."  (*Id.*).

That same month, March 2018, PSEGLI's Business Compliance Department directed Ethics and Compliance Investigator Carrie Dunican to investigate Plaintiff's disclosure of confidential vendor information.  (*Id.* ¶¶ 74–75; Dunican Decl. ¶ 4).  Her investigation involved reviewing Plaintiff's emails and led her to discover Plaintiff's fantasy football activities.  (Def. 56.1 ¶ 87; Dunican Decl. ¶¶ 5, 14).  Dunican and Senior Compliance Investigator Jen Bartoli interviewed Plaintiff on March 15, 2018.  (Dunican Decl. ¶ 6; Ex. A to Dunican Decl.).  According to their notes, Plaintiff admitted both to disclosing confidential vendor information and to using company resources for fantasy football.  (Def. 56.1 ¶¶ 78–81, 90–92; Dunican Decl. ¶¶ 7–9, 15; *see* Ex. A to Dunican Decl.).  Their notes further reflect that Plaintiff admitted "he is terrible at Excel."  (Ex. A to Dunican Decl.; *but see* Pl. 56.1 Resp. ¶ 82).

Zaweski held a PEP mid-point check in April 2018,[4] in which he observed that

---

[4]     Plaintiff admitted that the mid-point check occurred in "approximately April 2018," (Pl. 56.1 Resp. ¶ 52), but avers elsewhere that the meeting occurred on May 17, 2018, (Pl. Aff. ¶ 19).  Zaweski's PEP Follow-up form indicates Zaweski prepared the mid-point check form "at around 6 weeks into [the] plan," which would be in mid-April given that the PEP began on March 1, 2018.  (Ex. M to Camire Decl.).

Case 2:19-cv-05787-DRH-ST   Document 42   Filed 02/02/22   Page 10 of 33 PageID #: 626

"Plaintiff was demonstrating a commitment to improve his performance and adhere to the PEP, and that Plaintiff was 'on track' with the plan." (Def. 56.1 ¶ 52; Ex. M to Camire Decl.). At his deposition, Zaweski testified that while Plaintiff's "effort was improving" under the PEP, he did not necessarily think that Plaintiff's actual job performance was improving as well. (Def. 56.1 ¶ 53).

Plaintiff's doctor provided him with a heart monitor on May 18, 2018 and instructed him to wear it for thirty days. (Pl. Aff. ¶ 11). That month, Plaintiff advised Voltz that he could no longer play on PSEG's softball team because of his heart condition. (Pl. Aff. ¶ 15; *see* Voltz Tr. at 46:6–20). On May 23, 2018, Plaintiff met with Bryson and asked to be removed from storm duty because of his heart condition. (Def. 56.1 ¶¶ 143–44; *see* Ex. A to Bryson Decl.). Bryson instructed Plaintiff to provide her with a doctor's note, which he did on May 30, 2018. (Def. 56.1 ¶¶ 145–46; *see* Ex. J to Camire Decl.). Bryson avers she did not tell anyone Plaintiff requested to be removed from storm duty, did not tell anyone Plaintiff provided a doctor's note, and did not share the doctor's note with anyone. (Bryson Decl. ¶ 11). Plaintiff's request remained pending with Bryson at the time he was terminated; no storms occurred in the interim. (*See* Pl. 56.1 Resp. ¶¶ 149–51, 153).

On June 12, 2018, Voltz submitted a memo on Plaintiff's ethics violations to the Human Resources Panel members reviewing the investigations. (Ex. U to Camire Decl.). Citing Plaintiff's violations occurring "two times within the past eight months," Plaintiff's poor performance, and Zaweski and his lack of confidence, Voltz recommended termination. (*Id.*). The Human Resources Panel reviewed the fantasy

football incident on June 14, 2018 and the confidential information disclosure incident on June 18, 2018.   (Ex. O to Degrassi Decl.).   It adopted Voltz's recommendation to terminate Plaintiff.  (Def. 56.1 ¶ 102; *see* Ex. U to Camire Decl.). The Panel disciplined others as well, although none of them were on a PEP, had job performance issues, or were the subject of multiple compliance investigations.  (Def. 56.1 ¶¶ 105, 107–08, 111, 113–15).  Zaweski received a Corrective Action Letter and a reduction in his 2018 bonus for failing to respond to Plaintiff's emails shortly after Plaintiff disclosed the confidential information.   (*Id.* ¶ 106).   Plaintiff's fantasy football league mates too received Corrective Action Letters and reductions in their 2018 bonuses for their fantasy football-related violations.   (*Id.* ¶ 112).   Voltz terminated Plaintiff on June 27, 2018; his letter references Plaintiff's "two violations of the Company's Standards of Conduct" and performance "below expectations."  (Def. 56.1 ¶¶ 103–04; Ex. N to Camire Decl.).

### F.    Procedural Posture

Plaintiff brought this action on October 14, 2019, alleging six causes of action: (1) discrimination on the basis of disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), against PSEG and PSEGLI; (2) retaliation in violation of the ADA, 42 U.S.C. § 12203, against PSEG and PSEGLI; (3) discrimination on the basis of disability in violation of Title VII against PSEG and PSEGLI; (4) retaliation in violation of Title VII against PSEG and PSEGLI; (5) discrimination on the basis of disability in violation of the New York State Human Rights Law ("NYSHRL") against all Defendants; and (6) retaliation in violation of the

NYSHRL against all Defendants.  (Compl. [DE 1]).  The parties proceeded right into discovery.  Defendants moved for summary judgment on all claims on March 22, 2021.  (Def. Mem. [DE 36-10]; Pl. Opp. [DE 37]; Def. Reply [DE 38]).

## LEGAL STANDARD

Summary judgment, pursuant to Rule 56, is appropriate only where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When making this determination, a court must view all facts "in the light most favorable" to the non-movant, *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014), and "resolve all ambiguities and draw all permissible factual inferences in favor of the [non-movant]," *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  Thus, "[s]ummary judgment is appropriate [only] where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant]." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (internal quotation marks omitted).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts demonstrating that there is a genuine dispute of material fact to be tried.  *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-movant

must present more than a "scintilla of evidence," *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586–87), and "may not rely on conclusory allegations or unsubstantiated speculation," *id.* (quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions," *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the [non-movant] will bear the burden of proof on an issue at trial, the moving party may satisfy its burden by pointing to an absence of evidence to support an essential element of the [non-movant's] case." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (quoting *Brady*, 863 F.2d at 210–11) (internal quotation marks omitted). Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish his claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). "[A] complete failure of proof concerning an essential element of the [non-movant's] case necessarily renders all other facts

immaterial." *Crawford*, 758 F.3d at 486 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

The Court addresses the Defendants' summary judgment arguments in the following order: (I) discriminatory termination of Plaintiff in violation of the ADA and NYSHRL; (II) retaliation in violation of the ADA and NYSHRL; (III) failure to accommodate Plaintiff in violation of the ADA and NYSHRL; (IV) Voltz's individual liability under the NYSHRL; and (V) Plaintiff's Title VII claims.

## I.     ADA and NYSHRL Discriminatory Termination

Plaintiff contends Defendants' discriminatory animus toward his disability motivated his termination. Discrimination claims brought pursuant to the ADA and the NYSHRL are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bourara v. New York Hotel Trades Council & Hotel Ass'n of New York City, Inc., Emp. Benefit Funds*, No. 20-3092, 2021 WL 4851384, at *1 (2d Cir. Oct. 19, 2021) (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (ADA) and *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (NYSHRL)). First, Plaintiff bears a *de minimis* burden to establish his prima facie case – that (1) his employer is subject to these laws; (2) he was disabled within the meaning of these laws; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *Sista*, 445 F.3d at 169; *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). If he

does, Defendants "must offer through the introduction of admissible evidence a legitimate non-discriminatory reason" for termination.  *Id.*  If Defendants can do so, "Plaintiff then must show that the proffered reason was merely a pretext for discrimination." *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program*, 198 F.3d 68, 72 (2d Cir. 1999).

### A.    First *McDonnell Douglas* Stage: Plaintiff's Prima Facie Case

Defendants dispute the last element of Plaintiff's prima facie case, *i.e.*, that Plaintiff was terminated because of his disability.  Def. Mem. at 14.  Plaintiff correctly observes that the "circumstances giving rise to an inference of discrimination" include "a sequence of events leading to an employee's termination" and "the timing of the termination."  Pl. Opp. 7–8 (citing *Brenner v. City of New York Dep't of Educ.*, 132 F. Supp. 3d 407, 420 (E.D.N.Y. 2015)).  Here, Defendants terminated Plaintiff twenty-eight days after his request to be removed from storm duty.  Pl. Opp. at 7–8. This "close proximity in time between the [reasonable accommodation] request and the termination," Plaintiff contends, "is sufficient evidence to give rise to an inference of discrimination."  *Id.*

In discriminatory termination cases, as in their retaliation brethren, timing alone does not create an inference of discriminatory where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity." *Vitti v. Macy's Inc.*, 758 Fed. App'x 153, 157–58 (2d Cir. 2018) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)) (affirming a grant of summary judgment based on this principle in both ADA discrimination and

retaliation claims); *Telesford v. New York City Dep't of Educ.*, 2021 WL 456201, at *3–4 (E.D.N.Y. Jan. 6, 2021); *see Powell v. Merrick Acad. Charter Sch.*, 2018 WL 1135551, at*6–8 (E.D.N.Y. Feb. 28, 2018).

Given Defendants' escalating disciplinary actions against him, Plaintiff's reliance solely on temporal proximity is not enough. Plaintiff requested a reasonable accommodation from Bryson on May 23, 2018, almost three months after he became subject to two ethics investigations, received his third unsatisfactory year-end performance review, and began his PEP. Plaintiff approached Bryson some six months after Zaweski emailed Degrassi a litany of issues with Plaintiff's performance. Ex. N to Degrassi Decl. Plaintiff's employment was problematic from the outset—as seen by his first year-end performance review—and his difficulties continued from that point forward. The sequence of events leading to his termination demonstrates the twenty-eight day interval between Plaintiff's accommodation request and termination "is not suspicious enough alone to create" an inference of discrimination. *E.g.*, *Wein v. New York City Dep't of Educ.*, 2020 WL 4903997, at *13 (S.D.N.Y. Aug. 19, 2020) (quoting *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 855 (S.D.N.Y. 2013)).

Assuming *arguendo* that Plaintiff's proof establishes a prima facie case of disability discrimination, Plaintiff has failed as a matter of law to produce evidence to permit a rational finder of fact to conclude that Defendants' reasons for his termination are pretextual.

## B.     Second *McDonnell Douglas* Stage: Defendants' Reasons for Termination

Defendants offer two non-discriminatory reasons for Plaintiff's termination in order to meet their burden at the second stage of the *McDonnell Douglas* test. Defendants' "burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted).

First, Defendants justify Plaintiff's termination by pointing to Plaintiff's poor performance from the outset of his employment. Def. Mem. at 14–16. "When an employer comes forth with evidence of a long and well-documented history of deficient performance, the second stage of the *McDonnell Douglas* test is satisfied." *Hayes v. Cablevision Sys. New York City Corp.*, 2012 WL 1106850, at *15 (E.D.N.Y. Mar. 31, 2012).

Second, Defendants cite Plaintiff's two ethics violations as an additional reason for termination. Def. Mem. at 15–16. "[A]n employer's good faith belief that an employee has engaged in misconduct provides the employer with a legitimate, non-discriminatory reason for termination, even where there are factual issues as to whether the employee actually engaged in misconduct." *Hammond v. Keyspan Energy*, 2009 WL 10296057, at *3 (E.D.N.Y. May 15, 2009), *aff'd*, 349 Fed. App'x 629 (2d Cir. 2009).

## C.     Third *McDonnell Douglas* Stage: Plaintiff's Proof of Pretext

Plaintiff's burden at the pretext stage requires him "to submit admissible evidence from which a finder of fact could infer that the defendant's employment

decision was more likely than not based in whole or in part on discrimination." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (internal quotation marks omitted); *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) ("[T]he plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." (internal quotation marks omitted)). "In other words, 'it is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'" *Reeves*, 530 U.S. at 147 (2000) (ellipses and emphases in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)). No reasonable jury could find Defendants' reasons for terminating Plaintiff were a pretext hiding intentional discrimination.

### 1.    Reason #1: Plaintiff's Poor Performance

Plaintiff contends his "poor performance" is pretext because, at his mid-point PEP review, Zaweski stated Plaintiff was "showing improvement." Pl. Opp. at 8–9. But while Zaweski's statement may permit a jury to "disbelieve" Plaintiff's "poor performance" as a legitimate reason to terminate, "it is not enough" to permit a jury to "believe the plaintiff's explanation of intentional discrimination" on the basis of disability. *Reeves*, 530 U.S. at 147. There is no evidentiary foundation to suggest Zaweski's review could (or would) insulate him from termination. In fact, the evidence affirmatively demonstrates the opposite. As seen on a page bearing Plaintiff's signature, the PEP warned:

> The plan is designed to allow for formal evaluations at periodic intervals during the plan duration. However, nothing in this plan guarantees your continued employment for any period of time.

Ex. L to Camire Decl. Although Plaintiff contends his "performance only improved" after being placed on the PEP, his "belie[f] that the decision to terminate him was objectively incorrect 'does not demonstrate, by itself, that the employer's proffered reasons are a pretext for termination.'" *Hammond*, 2009 WL 10296057, at \*3 (quoting *Joy v. Kinplex Corp.*, 2008 WL 1995370, at \*7 (E.D.N.Y. May 6, 2008)).

Nor can pretext be found in Zaweski's alleged testimony "that he did not recall any consideration of firing [Plaintiff] following his 2017 performance review before placing Plaintiff on the PEP." Pl. Opp. at 9 (citing Zaweski Tr. at 60–61). These pages of Zaweski's deposition transcript are not in the record. Even if Plaintiff accurately recites the testimony, the point is immaterial. Plaintiff's history of poor performance, according to Zaweski, was not the only reason Defendants terminated Plaintiff. Indeed, Zaweski testified that their decision also arose from PSEGLI's investigatory findings into Plaintiff's ethics violations. Those findings came to light *after* Plaintiff was placed on the PEP. *See* Zaweski Tr. at 79:13–81:25. In line with his testimony, "once the decision [to terminate] is made[,] [PSEGLI] moves pretty quickly." Zaweski Tr. at 70:5–14. The investigatory findings were submitted on June 12, 2018; PSEGLI terminated Plaintiff on June 27, 2018. *See* Exs. U, N to Camire Decl.

Plaintiff has failed to raise a genuine question of material fact on whether Defendants' proffer that his poor performance justified termination was a pretext for disability discrimination.

### 2.   Reason #2: Plaintiff's Two Ethics Violations

Plaintiff next argues his "ethics violations" too are pretextual of disability discrimination.

Explaining his disclosure of confidential information, Plaintiff states, "[A]ll I did was forward an email [with the password-protected Excel spreadsheet] sent to me by Zaweski." Pl. Aff. ¶ 23; Pl. Opp. at 4 ("[Plaintiff] merely forwarded the information Zaweski sent him."). This attempt to rationalize the violation—by, for example, shifting blame onto Zaweski—"does not establish discriminatory animus." *Murphy v. City of Newburgh*, 2018 WL 4625806, at *8 (S.D.N.Y. Sept. 26, 2018) (McCarthy, Mag. J.), *aff'd*, 785 Fed. App'x 900 (2d Cir. 2019); *Taylor v. Polygram Recs.*, 1999 WL 124456, at *10 (S.D.N.Y. Mar. 8, 1999) ("The evidence, even if viewed most favorably to Plaintiff, merely serves to shift the blame for, or rationalize, these incidents to show that the criticism was undeserved[,]" which "does not establish pretext."). Rather, in shifting the blame to Zaweski, Plaintiff has confirmed the legitimacy of the charge – *i.e.*, that an ethics violation *did* occur. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997) ("While [Plaintiff] attempted to deny that he was tardy, he also attributed his tardiness to his car purchase efforts and to Company policy that prohibited him from parking in a lot that was nearer the warehouse if he drove a non-Chrysler car. [Plaintiff's] explanations, even if true, in fact confirmed the validity of the tardiness criticisms."). Finding both at fault, PSEG penalized Zaweski alongside Plaintiff for the incident. Pl. Aff. at ¶ 23. Plaintiff has rationalized his conduct – but that does not create a genuine issue of material fact. *McLee*, 109 F.3d at 135

(rationalizing "deficiencies" does not "demonstrat[e] [] any genuine issue of material fact to be tried").

As to the fantasy football violations, Plaintiff points out that his two league mates "were merely reprimanded and not terminated." Pl. Opp. at 9. But they did not have a history of poor performance evaluations, were not on a PEP, and were not also subject to an additional ongoing ethics investigation. In the end, they had not twice violated PSEGLI's Standards of Conduct. No reasonable juror could find that they were similarly situated "in all material respects" to Plaintiff because the two did not engage in comparable misconduct. *Risco v. McHugh*, 868 F. Supp. 2d 75, 100 (S.D.N.Y. 2012); *Jenkins v. St. Luke's–Roosevelt Hosp. Ctr.*, 2009 WL 3682458, at *7– 8 (S.D.N.Y. Oct. 29, 2009). There is no genuine question of material fact surrounding this disparate treatment theory of pretext.

And, even assuming Plaintiff dutifully followed the Standards of Conduct, he fails to offer evidence disputing his "employer's belief that [he] violated company policy," which "need not be accurate to serve as a legitimate reason for termination, as long as that belief was honestly held." *Saunders v. New Horizons Computer Learning Ctr. of Metro. New York*, 2002 WL 1067823, at *4 (S.D.N.Y. May 29, 2002), *aff'd*, 68 Fed. App'x 224 (2d Cir. 2003); *see Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008) (Bianco, J.) ("[A]n employee disagree[ing] with the results of an employer's decision regarding termination, or even [his] evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a

pretext for termination."). "[I]t is not the function of a fact-finder to second-guess business decisions or to question a corporation's means to achieve a legitimate goal." *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

All three Defendants are entitled to, and are hereby granted, summary judgment in their favor on Plaintiff's ADA and NYSHRL discriminatory termination claims.

## II. Retaliation

Plaintiff contends that Defendants retaliated against him because he requested Bryson relieve him of storm duty due to his heart condition, *i.e.*, because he requested a reasonable accommodation for his disability.  Pl. Opp. at 9–10.

Plaintiff's retaliation claims under the ADA and NYSHRL claims are also subject to the *McDonnell Douglas* burden-shifting framework.  *Nassry v. St. Luke's Roosevelt Hosp.*, 2016 WL 1274576, at *14 (S.D.N.Y. Mar. 31, 2016) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (ADA) and *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (NYSHRL)).  Plaintiff's prima facie retaliation case must establish: (1) the employee was engaged in [a protected] activity . . . , (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action."  *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (quoting *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)).

Defendants target the fourth element: causation.  Plaintiff's argument to this end rests solely on temporal proximity—viz. the twenty-eight days between his

request to be relieved from storm duty and his termination.  The Second Circuit has not yet decided "whether a plaintiff must show, in order to succeed on her ADA retaliation claim, that the retaliation was a 'but for' cause of the adverse employment action or merely a 'motivating factor.'"  *Norman v. NYU Langone Health Sys.*, 2021 WL 5986999, at *5 (2d Cir. Dec. 17, 2021) (quoting *Flieger v. E. Suffolk BOCES*, 693 Fed. App'x 14, 18 (2d Cir. 2017)).  Even so, no inference of causation arises from temporal proximity where termination was "both part, and the ultimate product, of an extensive period of progressive discipline."  *Perez v. City of New York*, 843 Fed. App'x 406, 408 (2d Cir. 2021) (quoting *Slattery*, 248 F.3d at 95).  Plaintiff's causation argument thus comes without sufficient evidence to withstand summary judgment.

As above, Defendants' escalating disciplinary actions against Plaintiff led to his termination.  The record demonstrates Plaintiff's termination comes on the heels of two ethics investigations undertaken during Defendants' rehabilitative efforts to improve his performance.  Aside from temporal proximity, Plaintiff provides no other circumstantial or direct evidence "of a causal nexus between [his] protected activity and the alleged adverse employment actions he suffered."  *Clark v. Coca-Cola Beverages Ne., Inc.*, 2022 WL 92060, at *5 (2d Cir. Jan. 10, 2022) (quoting *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019)).

Plaintiff points to Defendants' awareness "of [Plaintiff's] disability at the time they made the decision to terminate him," but this misapprehends the causation inquiry.  Pl. Opp. at 10.  Causation follows from either (i) a decisionmaker's direct or circumstantial knowledge of the protected activity or (ii) the decisionmaker acting

pursuant to the explicit or implicit orders from, or encouragement of, a superior with the requisite knowledge (*i.e.*, acting as the superior's "cat's paw"). *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 147–48 (2d Cir. 2010). Plaintiff has failed to adduce direct or circumstantial knowledge that any decisionmaker knew he made a reasonable accommodation request. The only individual with knowledge of Plaintiff's request, Bryson, avers she "had no role whatsoever in the decision to terminate" Plaintiff and she "did not share [Plaintiff's] doctor's note . . . [nor] tell anyone that [Plaintiff] requested to be removed from storm duty or provided [her] with a doctor's note." Bryson Decl. ¶¶ 11, 13; Pl. 56.1 Resp. ¶ 155 (admitting same). Plaintiff admits he himself did not share or discuss the doctor's note with anyone else. Pl. 56.1 Resp. ¶ 154. Voltz testified he was unaware of Plaintiff's reasonable accommodation request and the doctor's note. Voltz Tr. at 38:2–12, 40:5–11, 41:9–14, 43:5–44:1 ; Pl. 56.1 Resp. ¶¶ 155, 157–60 (admitting same). The same is true of Zaweski. Zaweski Tr. at 66:24–68:11; Pl. 56.1 Resp. ¶ 161 (admitting same). Plaintiff cites no admissible evidence to fight this point. "If the most that can be hoped for is the discrediting of [Bryson, Voltz, and Zaweski's] denials at trial, no question of material fact is presented." *See Mod. Home Inst., Inc. v. Hartford Acc. & Indem. Co.*, 513 F.2d 102, 110 (2d Cir. 1975); *see also Anderson*, 477 U.S. 242, 256–57 (1986) ("[D]iscredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion" to defeat summary judgment where plaintiff "has had a full opportunity to conduct discovery.").

Lacking any evidence and personal knowledge, he instead relies on conjecture.

Plaintiff avers:

> Bryson and Voltz worked closely together, and therefore *I believe it to be highly likely* that my doctor's note and reasonable accommodation request was shared with Voltz.

Pl. Aff. ¶ 14 (emphasis added).  Plaintiff testified:

> Q.   [W]hat is the basis of your belief that the doctor's note was shared with Mr. Voltz?
>
> A.   Because Mr. Voltz and Christine Bryson worked very closely  together.  That's why.
>
> Q.   So are you just assuming that the doctor's note was shared with Mr. Voltz?
>
> A.   I know many things transpired communication-wise and it would be very smart of Mike Voltz not to receive the doctor's note but to be told of the doctor's note.  That would be very smart.
>
> Q.   I'm asking you the factual basis for you saying that the doctor's note was share[d] with Mr. Voltz.  What are the facts that you are basing that on?
>
> A.   The fact that Mike Voltz and Christine Bryson work very closely together.
>
> Q.   Are there any other facts that you're basing your assumption that the doctor's note was shared with Mr. Voltz?
>
> A.   No.  Mike Voltz and Christine Bryon work very closely together.  Those are the facts.

Pl. Tr. at 90:18–91:15; *see id.* at 81:16–82:2, 87:23–88:17, 89:14–90:17.  Plaintiff's "conclusory statements, conjecture, [and] speculation" cannot defeat summary judgment.  *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

Plaintiff has failed to carry his burden to establish a prima facie retaliation case.  But even if he did, his evidence of pretext fails for the same reasons above.  *See*

Discussion Section I.C.1–2. Accordingly, Defendants shall be granted summary judgment in their favor on the ADA and NYSHRL retaliation claims.[5]

## III. Failure to Accommodate

Plaintiff's failure to accommodate claims under the ADA and NYSHRL revolve around Defendants' inaction and/or delay with respect to his request to be relieved of storm duty in 2017 and 2018. "[A] plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing . . . (1) plaintiff is a person with a disability . . . ; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential

---

[5]     Plaintiff's Statement of Fact remarks that "[i]n 2017, [Plaintiff] made his first request for a reasonable accommodation[] when he asked Zaweski . . . to be removed from storm duty." Pl. Opp. at 2. Plaintiff's briefing does not expressly premise his retaliation claim on this 2017 request; he circumscribes his analysis to the events in May and June 2018. *See* Pl. Opp. at 9–10. The Court deems any retaliation claim arising from Plaintiff's 2017 request forfeited.

Addressing it *arguendo*, first, the 2017 request shares no temporal proximity with his termination. Second, Plaintiff has no evidence to create an issue of fact as to whether Zaweski was a decisionmaker with respect to his termination. Voltz, with the blessing of a Human Resources Panel to which Zaweski did not belong, made the decision to terminate Plaintiff. Pl. 56.1 Resp. ¶¶ 102, 105–06; *see* Ex. U to Camire Decl.; Ex. O to Degrassi Decl. Yes, the record reflects that Voltz consulted Zaweski before terminating Plaintiff. Pl. 56.1 Resp. ¶ 96; Zaweski Tr. at 69:15–25 ("Q. Did you have a role in [Plaintiff's] termination? A. I was aware of it and I agreed with that approach."). But there is no evidence concerning the details of that consultation—viz. whether they discussed Plaintiff's 2017 request to be removed from storm duty—except for Plaintiff's testimony that he lacked personal knowledge on that exact issue. Pl. Tr. at 94:5–9 ("Q. Did Dan Zaweski ever tell you that he told Mike Voltz that you were trying to get off of storm duty? A. No. I can't say. I mean, I don't know what Dan told Mike. I don't know."). Moreover, Voltz testified that he was unaware of "any request by Plaintiff to be removed from storm duty." Pl. 56.1 Resp. ¶¶ 158–60. That is, any retaliation claim premised upon on a 2017 request to be removed from storm duty would arise from conjecture and speculation, not evidence.

functions of the job at issue; and (4) the employer has refused to make such accommodations." *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96–97 (2d Cir. 2009) (ADA); *Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 180 (2d Cir. 2016) (NYSHRL).[6] Defendants assume, for the purposes of the summary judgment motion, that "Plaintiff had a disability [but] could perform the essential functions of his position." Def. Mem. at 23 n.16. The question here is whether Defendants' inaction and/or delay reflects a failure to make a reasonable accommodation for Plaintiff's heart condition. Pl. Opp. at 6.

Plaintiff contends Defendants failed to act on two occasions. In February 2017, Plaintiff allegedly requested that Zaweski relieve him of storm duty. Then, in May 2018, Plaintiff requested Bryson do the same. Their respective inaction and/or delay, according to Plaintiff, reflect failures to accommodate. Pl. Opp. at 6–7 ("No remedial action was taken . . . .").

## A.    February 2017 Request

Plaintiff's claim that he requested a reasonable accommodation in February 2017 is problematic.

First, this theory is not asserted in the Complaint; the Complaint alleges only one accommodation request, namely, Plaintiff's request to Bryson in May 2018. "As a threshold matter, courts generally do not consider claims or completely new theories

---

[6]    Neither Plaintiff nor Defendants address *Natofsky v. City of New York*, in which the Second Circuit held "a plaintiff must show the *connections* between (1) the failure to accommodate a disability, (2) the performance deficiencies, and (3) the adverse employment action." 921 F.3d 337, 352 (2d Cir. 2019) (emphasis in original) (internal quotation marks omitted).

of liability asserted for the first time in opposition to summary judgment." *Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 344 (E.D.N.Y. 2010) (Bianco, J.) (citing cases); *see Lyman v. CSX Transp., Inc.*, 364 Fed. App'x 699, 701–02 (2d Cir. 2010) (no abuse of discretion in declining to consider new theories of negligence liability first raised in opposition to summary judgment). In *Greenidge v. Allstate Insurance Co.*, for example, the Second Circuit held that the district court did not abuse its discretion in declining to entertain a theory of bad-faith liability absent in the complaint and raised "for the first time in [] papers opposing [defendant's] motion for summary judgment"; for that reason, the Second Circuit also declined to address its merits. 446 F.3d 356, 361 (2d Cir. 2006) (Sotomayor, J.); *Syracuse Broad. Corp. v. Newhouse*, 236 F.2d 522, 525 (2d Cir. 1956) (district court "justified" in "brush[ing] aside" a new theory of antitrust liability "made in the briefs and affidavits, but not alleged in the complaint or subsequent statement of claims, nor in any way substantiated"). This basis alone suffices to grant summary judgment to Defendants on any failure to accommodate claim arising from Plaintiff's 2017 request. *E.g.*, *Martinez v. New York State Div. of Hum. Rts.*, 2015 WL 437399, at *13 (S.D.N.Y. Feb. 2, 2015) ("The plaintiff claims for the first time in her opposition that the defendants denied her an accommodation for her disability . . . . The Court need not consider a claim presented for the first time in an opposition to a summary judgment motion and will not do so here.").

Second, Plaintiff's argument is without citation to case law. "This failing effectively places on the court the burden of conducting the initial legal analysis that

is properly the responsibility of [Plaintiff's] counsel." *See Wenzhou Wanli Food Co. v. Hop Chong Trading Co., Inc.*, 2000 WL 964944, at *3 (S.D.N.Y. July 11, 2000) (internal quotation marks omitted).  The Court opts not to carry Plaintiff's burden for him.[7]

## B.    May 2018 Request

Plaintiff has not pointed to sufficient evidence to withstand summary judgment on his ADA and NYSHRL failure to accommodate claims based on his May 2018 reasonable accommodation request.

Almost all of the district courts in the Second Circuit recognize delay in-and-of itself does not rise to a failure to accommodate unless the inaction "was motivated by discriminatory intent." *McCrain v. Metro. Transp. Auth.*, 2020 WL 1285634, at *18 (S.D.N.Y. Mar. 18, 2020) (Abrams, J.) (internal quotation marks omitted).[8]  Likewise,

---

[7]    Parenthetically, the Court observes two more problems with the February 2017 claim.  First, this disability discrimination via a failure to accommodate claim arises only from Zaweski's inaction and/or delay.  But Plaintiff admits that "the only individual he alleges discriminated against him is Mr. Voltz."  Pl. 56.1 Resp. ¶ 163. Second, Plaintiff's ADA claim is untimely.   "A plaintiff raising a failure to accommodate claim must file a charge with the [Equal Employment Opportunities Commission (EEOC)] within 300 days after the alleged unlawful employment practice occurred." *Ferraro v. Sealift, Inc.*, 2018 WL 4299989, at *3 (E.D.N.Y. Sept. 10, 2018) (Bianco, J.) (internal quotation marks omitted); *see Harris v. City of New York*, 186 F.3d 243, 247–48 (2d Cir. 1999) (citing 42 U.S.C. § 2000e–5(e), incorporated into ADA by reference in 42 U.S.C. § 12117(a)).  The only EEOC charge in the record is dated September 27, 2018 – *i.e.*, more than 300 days after his February 2017 request.  Ex. Y [DE 38-2] to Reply Camire Decl.

[8]    *Tafolla v. Cty. of Suffolk*, 2021 WL 3675042, at *7 n.6 (E.D.N.Y. Aug. 19, 2021) (Seybert, J.); *Tillman v. New York City Dep't of Hum. Res. Admin.*, 2021 WL 1089647, at *5 (S.D.N.Y. Mar. 22, 2021) (Vyskocil, J.); *Choi v. Liberty Mut. Ins. Co.*, 2021 WL 790381 (E.D.N.Y. Feb. 9, 2021) (Kuntz, J.); *Franks v. Eckert*, 2020 WL 4194137, at *4 (W.D.N.Y. July 21, 2020) (Walford, J.); *Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 421 (S.D.N.Y. 2018) (Broderick, J.); *Wenc v. New London Bd. of Educ.*,

in a summary order, the Second Circuit has upheld a grant of summary judgment on this basis.  In *Hamedl v. Verizon Communications, Inc.*, the Second Circuit affirmed a district court's grant of summary judgment because the plaintiff "provided no evidence that his [reasonable accommodation request] . . . was delayed unreasonably due to some discriminatory intent by his employer, if it can even be said to have been unreasonably delayed."  557 Fed. App'x 68, 70 (2d Cir. 2014).

In the same vein, Plaintiff presents no evidence that Defendants' inaction and/or delay was unreasonable or was motivated out of discriminatory animus.  Only twenty-eight days elapsed between Plaintiff's May 2018 request to be relieved of storm duty and his termination.  Pl. Opp. at 6.  During that timespan, he served no storm duty shifts because, admittedly, there were no storms and thus no occasion for him to do so.  Pl. 56.1 Resp. ¶ 153.  In this light, Defendants' inaction and/or delay was not unreasonable.  There is no evidence to the contrary.  But even if there was, no evidence beyond inaction and/or delay in-and-of-themselves suggests Defendants

---

2016 WL 4410061 (D. Conn. Aug. 16, 2016) (Bolden, J.), *aff'd*, 702 Fed. App'x 27 (2d Cir. 2017); *Saunders v. Queensborough Cmty. Coll.*, 2015 WL 5655719, at *7 (E.D.N.Y. Sept. 24, 2015) (Chen, J.); *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 258 (S.D.N.Y. 2014) (Karas, J.); *Hamedl v. Weiland*, 2012 WL 3903499 (E.D.N.Y. Sept. 6, 2012) (Feuerstein, J.), *aff'd sub nom. Hamedl v. Verizon Commc'ns, Inc.*, 557 Fed. App'x 68 (2d Cir. 2014); *De La Rosa v. City of New York Police Dep't*, 2010 WL 4177626, at *9 (S.D.N.Y. Oct. 22, 2010) (Scheindlin, J.), *aff'd*, 461 Fed. App'x 73 (2d Cir. 2012); *Wildman v. Verizon Corp.*, 2009 WL 104196, at *2 (N.D.N.Y. Jan. 14, 2009) (Scullin, J.); *Lyman v. City of New York*, 2003 WL 22171518, at *6 (S.D.N.Y. Sept. 19, 2003) (Sweet, J.); *Powers v. Polygram Holding, Inc.*, 40 F. Supp. 2d 195, 202 (S.D.N.Y. 1999) (Conner, J.).  But that is not to say there is unanimity.  *Allen v. A.R.E.B.A. Casriel, Inc.*, 2017 WL 4046127, at *8 (S.D.N.Y. Sept. 12, 2017) (Failla, J.) ("[T]he Second Circuit has not made discriminatory intent a required element of a failure to accommodate claim.").

had discriminatory intent in so behaving. *See Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 260 (S.D.N.Y. 2015) ("Plaintiff points to no evidence that the purported five-week delay in granting her disability leave was motivated by discriminatory intent."). Indeed, Plaintiff quotes a decision expressly requiring him to demonstrate that a discriminatory motive caused the delay "rather than mere bureaucratic incompetence or negligence." Pl. Opp. at 6 (citing *Saunders v. Queensborough Cmty. Coll.*, 2015 WL 5655719, at *7 n.8 (E.D.N.Y. Sept. 24, 2015) (internal quotation marks omitted)). But like the *Saunders* plaintiff, Plaintiff here "has failed to tie [the] delay to any discriminatory intent on the part of Defendants." 2015 WL 5655719, at *7 n.8.

To Plaintiff, a genuine issue of material fact as to discriminatory intent exists because Zaweski and Bryson knew of Plaintiff's heart condition at the time they failed to act. Pl. Opp. at 6. This argument comes without citation to case law, and it does not withstand scrutiny. In failure-to-accommodate-by-delay claims, the discriminatory intent inquiry goes to the fourth prima facie element: whether the employer has refused to make such accommodation. The employer's knowledge of the disability is the second prima facie element. The argument as presented, which cites no precedent suggesting otherwise, does not persuade the Court to collapse the fourth element into the second – in other words, the Court declines to hold that, for failure-to-accommodate-by-delay claims, establishing the second prima facie element obviates the need to establish the fourth. *Compare McBride*, 583 F.3d at 96–97 (plaintiff must show "(2) an employer covered by the statute had notice of his

disability"), *with id.* (plaintiff must show "(4) the employer has refused to make such accommodations").

Defendants warrant a grant of summary judgment on the May 2018 failure to accommodate claim.

## IV.    Individual Liability

Voltz faces individual liability only under Plaintiff's NYSHRL claims.  *See* Compl. ¶¶ 65–70.  As above, Plaintiff cannot withstand summary judgment on any of his three NYSHRL theories (discriminatory termination, retaliation, and failure to accommodate) alleging primary responsibility.  Accordingly, regardless of whether Voltz's alleged liability is primary or secondary—the latter as an aider or abettor, *see* Pl. Opp. at 23—summary judgment shall be granted to Voltz on the NYSHRL claims. *Patacca v. CSC Holdings, LLC*, 2019 WL 1676001, at \*17 (E.D.N.Y. Apr. 17, 2019) ("[T]here is no predicate finding that Defendants . . . engaged in unlawful disability discrimination against Plaintiff; therefore, a finding of aider-and-abettor liability . . . would be baseless.").

## V.    Title VII

Plaintiff contends PSEG and PSEGLI violated Title VII by discriminating and retaliating against him on the basis of disability.  Compl. ¶¶ 59–64.  Defendants correctly point out that Title VII does not prohibit discrimination on the basis of disability.  Def. Mem. at 24 (citing *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 152 (E.D.N.Y. 2018)).  Indeed, Title VII does not include disability among its protected characteristics: "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2;

*e.g.*, *Lee v. Saul*, 802 Fed. App'x 663, 664 (2d Cir. 2020) ("[D]iscrimination and retaliation based only on physical disability . . . is not covered by Title VII."); *Billings v. New York State Dep't of Corr. & Cmty. Supervision*, 2021 WL 4150925, at *4 n.2 (S.D.N.Y. Sept. 10, 2021) ("Title VII does not prohibit discrimination based upon disability."). Plaintiff's opposition brief does not contest the point. *See* Pl. Opp.; Def. Reply at 14. Accordingly, Defendants' motion for summary judgment on the Title VII claims is granted.

**CONCLUSION**

For the reasons discussed above, Defendants' motion for summary judgment is granted. The Clerk of Court is respectfully directed to enter judgment accordingly and to terminate the action.

**SO ORDERED.**

Dated: Central Islip, New York             s/ Denis R. Hurley
      February 2, 2022                    Denis R. Hurley
                                    United States District Judge